IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 19-00047-01-CR-W-HFS |
| Donnell Mullins, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court is the MOTION TO SUPPRESS EVIDENCE [Doc. 28] filed by defendant Donnell Mullins ("Mullins") on July 30, 2019. On December 4, 2019, the undersigned held an evidentiary hearing on Mullins' motion. Mullins was present and was represented by his counsel, Federal Public Defender Carie Allen. The government was represented by Assistant United States Attorneys Caleb Aponte and Joseph Marquez. At the hearing, testimony was provided by Officer Malcolm Whitelaw with Kansas City (Mo.) Police Department. Additionally, a DVD of a dashcam video was admitted into evidence as Gov't #1.

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned recommends that Mullins' motion to suppress be granted and submits the following proposed findings of facts and proposed conclusions of law.

### PROPOSED FINDINGS OF FACT

1. On January 31, 2019, Malcolm Whitelaw was a uniformed patrol officer with the Kansas City (Mo.) Police Department. Tr. at 4.

2. On that date, at approximately 4:21 p.m., Officer Whitelaw responded to a report of a home break-in in the area of East 69th Street and Walrond Avenue in Kansas City. Tr. at 5.

3. The report included no description of a suspect or suspects – no information on number of individuals, race, age, gender, or clothing. Tr. at 14.

4. The report only alleged a burglary and that copper and appliances were being stolen. Tr. at 14-15.

5. As Officer Whitelaw was approaching the scene of the reported break-in in his marked police vehicle, Officer Whitelaw observed a black male walking down the street with his "head tucked down" and "looking over his shoulder" at the police car. Tr. at 9.

6. The pedestrian was wearing headphones. Tr. at 19-20.

7. The pedestrian was walking on the sidewalk and did not appear headed to any vehicles and had no bags, packages, duffle bag or backpack. Tr. at 16.

8. After driving past the black male pedestrian, Officer Whitelaw turned his vehicle around and "decided to go and stop and talk to [the pedestrian] and see if there was anything there." Tr. at 10, 17.

9. According to Officer Whitelaw, he decided to stop and talk to the pedestrian because he "looked away" and "tucked his head" as if he did not want the officer "to pay attention to him or say anything to him, which is something that people tend to do when they see the police, they get nervous." Tr. at 10, 17, 21.

10. Office Whitelaw activated his lights, brought his vehicle to a stop at an angle near the pedestrian, and asked the pedestrian to come to him. Tr. at 13, 17.

11. Once he activated his lights, Officer Whitelaw did not believe the pedestrian was free to leave until he at least answered some questions. Tr. at 17-18, 22.

12. As the pedestrian approached, he removed his headphones and Officer Whitelaw asked him if he had a gun and the pedestrian said that he did have a gun. Tr. at 10, 19-20.

13. Officer Whitelaw then placed the pedestrian in handcuffs. Tr. at 11, 19.

14. Officer Whitelaw then asked the pedestrian his name and learned that he was Mullins. Tr. at 12.

15. Officer Whitelaw ran Mullins' name and the serial number from the handgun on Mullins' person and learned that: (1) Mullins was a felon, (2) Mullins was wanted on an outstanding Jackson County warrant, and (3) the handgun had been reported as stolen. Tr. at 12.

**PROPOSED CONCLUSIONS OF LAW**

In his motion to suppress, Mullins argues that his initial detention by Officer Whitelaw was unconstitutional and, consequently, the fruits of that illegal detention (the search of Mullins' person that led to the discovery of the handgun and subsequent arrest) must be suppressed. To be sure, the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, though, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the issue in this case, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id.* at 30, 88 S.Ct. at 1884-85. However, an officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883. Moreover, the mere fact that

an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. *Id.* at 417, 101 S.Ct. at 695. Moreover, it is well-settled that:

> [n]ot all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones,* 269 F.3d 919, 925 (8th Cir. 2001). The determination of when an encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case." *Id.* Nonetheless, several matters have been considered by the courts and as summarized by the Eighth Circuit:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Mere police questioning does not constitute a seizure, and so long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. It is clearly not a

> seizure, for example, for an officer to approach an individual in a
> public setting, identify himself as a police officer, and ask the
> individual to step aside and talk to detectives. A request to see
> identification is not a seizure, as long as the police do not convey a
> message that compliance with their request[ ] is required. There is
> no *per se* requirement that an officer inform a citizen of his right to
> refuse consent, and there is no presumption that consent is invalid
> where given without an explicit notification of the right to refuse.
> That many people agree to speak with police when asked does not
> tend to suggest that reasonable persons do not feel free to decline.
> While most citizens will respond to a police request, the fact that
> people do so, and do so without being told they are free not to
> respond, hardly eliminates the consensual nature of the response.

*United States v. Vera,* 457 F.3d 831, 834-35 (8th Cir.2006) (*citations and internal quotations omitted*).  Rather, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1872-73 (1980).

In the present case, the Court finds that an investigatory detention occurred when Office Whitelaw activated his vehicle lights, parked his vehicle at an angle near the sidewalk, and ordered Mullins to approach the vehicle, thereby triggering Fourth Amendment scrutiny.  In other words, the Court agrees with Officer Whitelaw that a reasonable person would not have believed that he or she was free to leave without answering at least some questions.

Nonetheless, the Government asserts that this "pedestrian check" or investigative detention by Officer Whitelaw was justified under a reasonable suspicion analysis.  Consequently, the validity of the warrantless detention turns on an evaluation of the facts known to Officer Whitelaw prior to the stop and whether those facts provide an appropriate level of <u>objective</u> justification that criminal activity might be afoot.  With due respect to the officer, in this case, the Court finds that those facts do not satisfy the test for reasonable suspicion.

Based on the record before the Court, prior to initiating the investigative stop of Mullins, Officer Whitelaw was aware:

(a) A burglary of appliances and copper had been reported in the area; and

(b) Mullins was a pedestrian in the area and had his "head tucked down" and "looked over his shoulder" at the police car.

These facts – standing alone – simply fall short of the standard required to justify a *Terry* stop of a pedestrian. Moreover, inasmuch as the Court concludes that the initial stop was itself unconstitutional, the subsequent fruits of that initial stop should be suppressed.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **GRANTING** the MOTION TO SUPPRESS EVIDENCE [Doc. 28] filed by defendant Donnell Mullins on July 30, 2019.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

          */s/ John T. Maughmer*
          **John T. Maughmer**
          **United States Magistrate Judge**